UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cr-69-HSM-SKL |
| | ) | |
| TRAVIS D. MELTON, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Travis D. Melton ("Defendant") seeking to suppress all evidence resulting from a vehicle stop [Doc. 117].[1]   Defendant alleges the stop violated the Fourth Amendment to the United States Constitution because it was not supported by probable cause or reasonable suspicion.   Plaintiff United States of America ("the government") filed a response in opposition to the motion [Doc. 136].   An evidentiary hearing on the motion was held October 10, 2017.   After fully considering all of the parties' evidence and argument, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

### I.    FACTUAL BACKGROUND

During the evidentiary hearing, the government presented the testimony of former Deputy Jesse Wilkey ("Wilkey") of the Rhea County Sheriff's Department.[2] Defendant presented no witnesses.   Following are the pertinent facts.

On February 23, 2017, Wilkey was in his marked patrol car engaged in his regular patrol

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) [Doc. 118].

[2] Deputy Wilkey is no longer a law enforcement officer.

duties, including the duty to look for and ticket traffic violations. At some unknown time prior to the stop at issue, Wilkey was contacted on his cell phone by his "superiors" at the Rhea County Sheriff's Office and told to be on the lookout for a silver Mercedes Benz ("Mercedes"). The superiors requested that Wilkey look for a traffic violation involving the Mercedes and conduct a traffic stop of it "if it had a traffic violation."

Around 4:23 p.m., Wilkey saw the described Mercedes traveling in a northbound lane as he drove southbound on Highway 27, which has two lanes in each direction and a median. Wilkey quickly turned around to catch up to the Mercedes. He was "probably a half a mile" behind when he began traveling north. As he traveled, he observed the Mercedes change lanes. At various times in his testimony, he described the traffic as "busy" and the day as sunny, clear, and dry.

Wilkey initially indicated he was a safe driving distance behind the Mercedes without any cars between him and the Mercedes as he neared the turning lane to the Walmart. He subsequently indicated that there may have been cars between him and the Mercedes near the turning lane and that he could not specifically recall whether there were any such cars. As he got closer behind the Mercedes, while there still may have been a car between him and the Mercedes, Wilkey thought the Mercedes abruptly "turned right from the turn lane" (without stopping at the red light) toward the Walmart parking lot. Wilkey believed the turn to be abrupt to avoid him, but he did not indicate it was any sort of traffic law violation.

As he pulled a safe following distance of a car length to a car length and a half behind the Mercedes, "right before" they got to the Walmart, Wilkey looked for tag information to "call in on the radio" and observed what he thought was a "drive out," or temporary tag, violation. With no cars between him and the Mercedes at that time, Wilkey concluded the tag was "improperly displayed" because he could not read the expiration date numbers on the tag due to the tilt of the

2

rear window and the glare of the sun on the defrosters and glass. Specifically, Wilkey could see that the Mercedes had a temporary tag taped to the inside of the rear window, but he could not "read the tag to even tell if it's expired or not, so I stopped it then."

Wilkey agreed that he stopped the Mercedes for two reasons: (1) his superiors asked him to stop it if he observed a traffic violation and (2) he observed what he concluded was the improper display of a drive out tag. Wilkey testified that *if* he could have read the tag information from a safe driving distance, then the choice to display the tag taped to the rear window (instead of on the rear area of the car designated for placement of a permanent license plate) would not be considered a violation of Tennessee law. He agreed that distance and viewing angle affect the ability to read a drive out tag placed in a rear window.

Wilkey activated his siren and blue lights in the Walmart parking lot. The Mercedes then came to a "crossways" stop in a parking space, and Wilkey pulled his patrol car behind the Mercedes. Wilkey called in the stop, but could not call in the tag information as he still could not read the temporary tag even when stopped behind the Mercedes in the parking lot. It was not until he approached the Mercedes on foot that Wilkey could see the numbers on the temporary tag. At that point, Wilkey could see that the tag was current, was not "blocked" by a tag frame, sticker, or other foreign material, and was in good condition.

Wilkey testified that upon his initial contact with the driver, he immediately detected that she was intoxicated. He also testified that it was after he detected her intoxication that he asked for each occupant's driver's license.[3] After he obtained the license of both the driver and Defendant, who was the sole passenger in the Mercedes, he returned to behind his patrol car "to

---

[3] Wilkey testified very briefly as to his immediate development of independent reasonable suspicion to detain the occupants further, and Defendant conceded he was not challenging the scope or duration of the stop, but was only disputing the lawfulness of the initial stop.

call in the information."

Most events that occurred after the stop are not directly at issue in the motion to suppress and will not be addressed herein. As pertinent to the motion to suppress, a Tennessee Multiple Offense Citation, which Wilkey began completing at 4:47 p.m. the day of the stop, was issued to the driver for "[i]mproper display" of the tag in violation of Tennessee Code Annotated § 55-4-110 and driving without proof of insurance at the time of the stop in violation of Tennessee Code Annotated § 55-12-139. The citation, which was made Defendant's Exhibit 1, contains a narrative for the violation of § 55-4-110, which states only: "Drive out tag was unable to be read."

Eventually, cash and methamphetamine, the evidence Defendant seeks to suppress, were located in the Mercedes. Defendant was arrested and transported to the jail around 5:26 p.m. and, thereafter, Wilkey prepared the text of his arrest report before his shift ended at 7:00 p.m. that night. The Affidavit of Complaint and Arrest Warrant, Defendant's Exhibit 2, were presented to the state court and signed by Wilkey the next morning. None of the documents prepared by Wilkey mention a specific reason he was unable to read the tag, such as glare.

Wilkey identified Government's Exhibit 1 as a photograph of the tag in the rear window of the Mercedes taken on a different day in wet weather conditions.

## II.     ANALYSIS

Defendant seeks to suppress all evidence resulting from the traffic stop and his ensuing arrest on February 23, 2017.[4]  Defendant argues Wilkey did not possess the requisite probable cause or reasonable suspicion to make the traffic stop because the drive out tag was current,

---

[4] Defendant argues that Count 6 and the related forfeiture allegations of the Indictment should be dismissed if his motion to suppress is granted. Although the motion seeks to suppress any statements made by Defendant related to the stop, during the hearing the parties agreed they have no knowledge of any statements made by Defendant in connection with this stop and the ensuing arrest.

unobstructed, and properly displayed in the rear window of the vehicle.  The government argues

Wilkey had reasonable suspicion to stop the Mercedes for a violation of § 55-4-110(b), which

governs the display of registration plates or tags.

## A.  Standards

The cornerstone of Defendant's argument is the Fourth Amendment, which prohibits

unreasonable searches and seizures.   U.S. Const. amend. IV.[5]   The foundation for analysis of an

automobile stop is provided in *Terry v. Ohio*, 392 U.S. 1 (1968).   Stopping a vehicle and detaining

its occupants is a seizure—a non-consensual, investigative detention—under the Fourth

Amendment.  *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008).  Defendant, as the

proponent of the motion to suppress, generally bears the burden of establishing his Fourth

Amendment rights were violated, *see Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978), but it is the

government's burden to demonstrate by a preponderance of the evidence that the stop was

proper, *see United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990).   Evidence seized during

an unlawful traffic stop should be suppressed.   *United States v. Blair*, 524 F.3d 740, 748 (6th

Cir. 2008).

The United States Court of Appeals for the Sixth Circuit "has developed two separate

tests to determine the constitutional validity of vehicle stops: an officer must have probable cause

to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop

for a criminal violation."   *Blair*, 524 F.3d at 748; *see also Whren v. United States*, 517 U.S. 806,

810 (1996) (holding that stopping an automobile is reasonable where there is probable cause to

---

[5] A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth
Amendment right.  *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).   As a preliminary
matter, the government agrees that Defendant, as a passenger, had a legitimate expectation of
privacy with respect to the stop.   If either the basis for the initial traffic stop or the scope and
duration of the stop is unlawful, then the evidence obtained may be excluded; but in this case,
Defendant challenges only the basis for, not the scope or duration of, the stop.

believe a traffic violation has occurred); *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (holding that reasonable suspicion standard is sufficient for ongoing traffic violation but not a completed misdemeanor).

In *Simpson*, the Sixth Circuit directly addressed the standard applicable for a stop based on a violation of the Tennessee statute at issue in this case, § 55-4-110(b).   520 F.3d at 533. As held in *Simpson*, because an alleged "failure to keep a license plate 'clearly legible' is an ongoing violation of § 55-4-110(b), the standard of reasonable suspicion applies."   520 F.3d at 541.[6]   Given the clear direction of *Simpson*, and despite Defendant's suggestion that the circumstances of the instant stop may somehow warrant the application of the higher probable cause standard, I **CONCLUDE** the Court must apply the reasonable suspicion standard to determine the legality of this traffic stop for a violation of § 55-4-110(b).

The United States Supreme Court has recently addressed the standard of reasonable suspicion for a traffic stop, stating:

> The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity.   The reasonable suspicion necessary to justify such a stop is dependent upon both the content of information possessed by police and its degree of reliability. The standard takes into account the totality of the circumstances—the whole picture. Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a

---

[6] Although not cited in support of Defendant's suggestion to apply a probable cause standard, there are post-*Simpson* cases that speak in terms of probable cause for a tag violation stop despite the clear holding in *Simpson* that the reasonable suspicion standard applies.   For example, another Sixth Circuit panel—albeit in an unpublished decision where the parties apparently agreed there was probable cause for the stop—held a license plate violation provided probable cause to make a traffic stop without addressing whether the reasonable suspicion standard applied.   *United States v. Anderson,* 458 F. App'x 440, 441 (6th Cir. 2012). Such cases, however, do not suggest probable cause is required for a tag violation stop.

> preponderance of the evidence, and obviously less than is
> necessary for probable cause.

*Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (citations and quotation marks omitted);

*see also United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010) (holding that "for [a] traffic

stop to be permissible under the Fourth Amendment, a police officer must know or reasonably

believe that the driver of the car is doing something that represents a violation of law" and "that

police officers may not look for after-the-fact justifications for stops that would otherwise be

impermissible . . . .").

## B. Reasonable Suspicion for the Stop

Deputy Wilkey testified that he stopped the Mercedes because (1) he was told to if he

observed a traffic violation and (2) he observed a drive out tag violation due to the sun's glare on

the angled rear window and defrosters, which made it impossible for him to read the information

printed on the temporary tag.

Tennessee law regarding the legibility of a tag, in relevant part, states:

> Every registration plate shall at all times be securely fastened in a
> horizontal position to the vehicle for which it is issued . . . in a
> place and position to be clearly visible and shall be maintained free
> from foreign materials and in a condition to be clearly legible; . . . .

Tenn. Code Ann. § 55-4-110(b). Defendant has not disputed that the above statute applies to

the temporary tag at issue in this case. *See also Simpson*, 520 F.3d at 535 (predicting how

Tennessee's highest court would rule, and holding that § 55-4-110 applies to out-of-state vehicles

and temporary tags).

Noting it was not aware of any Tennessee case law establishing a precise distance from

which a temporary tag's expiration date must be visible and clearly legible, the Sixth Circuit in

*Simpson* held it was "reasonable to assume that more than a few feet is required." 520 F.3d at

7

542. Defendant did not argue that Wilkey's "safe driving distance" observation from a car length to a car length and a half back was unreasonable, but he does seem to raise concerns about whether there was another vehicle obstructing Wilkey's view. Wilkey's testimony was uncertain regarding exactly when there were cars between him and the Mercedes once they were both travelling north on Highway 27. However, he also credibly testified that, at a point where he was a safe driving distance from the Mercedes without a car between him and the Mercedes, he could not read the information on the tag. As a result, I **CONCLUDE** it is proper to assess reasonable suspicion of a violation of § 55-4-110(b) from Wilkey's vantage point as he drove a "safe distance" of a car length or two from the Mercedes without an intervening car blocking his view.

Stopping a vehicle in Tennessee for failing to meet the requirements of § 55-4-110(b) requires objectively reasonable suspicion. "[T]he proper question is not whether [Defendant] was, in fact, violating § 55-4-110(b)[;]" instead, the "question is whether [Deputy Wilkey] had an objectively reasonable suspicion that a violation of that statute was occurring." *Simpson*, 520 F.3d at 542 (holding that "even if the minimal legibility of the expiration date from a few feet away were enough to pass muster with section 110, the inability of the officer to perceive the expiration date while driving at very close proximity gave him at least reasonable suspicion to believe that the statute was being violated."). In *Simpson*, the court noted the temporary license plate violated Tennessee law because the expiration date was illegible as the tag was "faded, weathered, torn, and otherwise deteriorated." *Id.* at 544. Admittedly, no such circumstances exist here as the tag at issue was not deteriorated.

The Sixth Circuit in *Simpson* discussed *United States v. Wilson,* 205 F.3d 720 (4th Cir. 2000) (en banc), wherein the United States Court of Appeals for the Fourth Circuit unanimously

held that the inability of a police officer to perceive the expiration date on a temporary tag at night—where there was no other allegation of improper display—did not give rise to reasonable suspicion that the law was being violated. The officer in *Wilson* admitted that he never saw anything illegal about the tag or the operation of the car. There was no evidence the tag was improperly displayed or deteriorated. The Fourth Circuit held suppression was required because the officer's inability to see the written-in expiration date on the tag was a function of the darkness and the small space provided for writing in the date. The Fourth Circuit held that in the absence of "any evidence that the tag 'was illegible or in any way obliterated, smudged, or faded,' or otherwise violated the law," the court was "'compel[led to] conclu[de] that the officer lacked any articulable, reasonable suspicion that a violation had occurred.'" *Simpson*, 520 F.3d at 543 (quoting *Wilson,* 205 F.3d at 723-24 (alterations in original)). The Sixth Circuit distinguished the results in *Simpson* from *Wilson*

> for at least two reasons: (1) the officer in *Wilson* stated that "he never saw anything illegal about the tag" whereas in this case, Officer Ratcliff has steadfastly maintained that the illegibility of the expiration date was a violation of Tennessee law; and (2) unlike the tag in *Wilson,* the tag in this case was faded and deteriorating, precisely the circumstances that the *Wilson* court recognized might have changed the outcome in that case.

*Id.* (citation omitted).

Similar to *Simpson*, in this case Wilkey has steadfastly maintained he could not read the tag from a safe driving distance or even when parked behind the stopped Mercedes. Unlike in *Simpson*, however, the tag itself was not in a deteriorated condition. Defendant argues that if glare on an angled window for a short period of time is sufficient reasonable suspicion when a tag is properly affixed to a rear window and in pristine condition, then officers have *carte blanche* to pull over any vehicle with a similar window bearing a temporary license plate

depending on the position of the sun.

Addressing a possible overbroad application of § 55-4-110(b), the *Simpson* court held that "difficulty seeing a license plate at some unspecified distance or position, even if the license plate were visible at a closer distance or different position" does not justify a stop. *Id*. at 544 (quoting *State v. Hall*, No. E2006-01915-CCA-R3-CD, 2007 WL 2917728, at *4 (Tenn. Crim. App. Oct. 5, 2007) (holding that an officer's "subjective judgment that [a] license plate [that was affixed to a ladder on the back of a van] was 'hard to see' [without the use of the headlights on his patrol car] cannot be construed as a 'particularized and objective basis' for suspecting that the defendant was in violation of [§ 55-4-110(b)]," at least where the license plate was otherwise properly displayed)) (alternations in original). Here, however, Wilkey testified that the tag was not readable from a safe driving distance, or even when completely stopped, so this case does not involve a fleeting inability to read a hard-to-see expiration date on the tag which could be cured by drawing closer to the Mercedes.

*Simpson* also clearly held that "the Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags." *Id.* at 543 (quotation marks, citation, and bracket omitted). Wilkey's testimony, however, does not indicate he stopped the Mercedes merely because it had a temporary tag; instead, it had a tag he could not read from a safe driving distance.

In oral argument, Defendant cited to *State v. Hunt*, 302 S.W.3d 859, 863-65 (Tenn. Crim. App. 2009), which involved a nighttime stop of a vehicle based on a tag not being illuminated even though there was no statutory requirement that the tag be illuminated. Given that there was no street light or other illumination in the area, the stopping officer could not read the license plate from the position where he was parked, so he followed at a safe distance and was

10

Case 1:17-cr-00069-TRM-SKL Document 146 Filed 10/16/17 Page 10 of 14
PageID #: 523

still unable to read the tag due to darkness. *Id*. at 861. He then initiated a traffic stop. The officer was able to read the license plate, which was clear and unobstructed, as the cars slowed and the patrol car drew closer and the officer was able to read the license plate prior to coming to a complete stop. *Id*. The court addressed a prior version of § 55-4-110(b), which at that time did not require illumination, and held "the provision for clear visibility to address placement of the tag and the provision for clear legibility to address obscuring or interfering with the legibility of the tag . . . [should not] be interpreted to place upon the owner or operator of a vehicle an affirmative duty to light the tag to enhance its visibility or legibility after dark. *Id*. at 864 (also holding that a federal court's interpretation of § 55-4-110(b) is not binding on the Tennessee courts).

Unlike in *Hunt*, Wilkey could not read the tag at issue even when stopped. Defendant, however, contends that *Hunt* should be read as indicating that specific requirements such as illumination or, more to the point, unslanted windows without defroster lines that might result in glare when the sun in out, must be written into the statute to constitute reasonable suspicion. As argued by Defendant, a finding in the government's favor in this case could give rise to situations where certain cars may be pulled over because officers cannot read a temporary tag in an angled rear window depending on the sun's glare even though the temporary tag is unexpired and in a proper condition. Still, as I interpret *Simpson* and § 55-4-110(b), I **CONCLUDE** that the circumstances credibly described by Wilkey are sufficient to render a temporary investigative stop reasonable under the Fourth Amendment because Tennessee law required the temporary tag to be in a "place and position to be clearly visible . . . in a condition to be clearly legible" from a reasonable position and distance—and it was not in this case.

Wilkey's testimony that he could not read the tag—even once completely stopped behind

the Mercedes—was credible.    A court is given wide latitude in making its credibility determinations.  *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002).    "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic."  *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) (Lee, MJ) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)).    I **FIND** that Wilkey's appearance, demeanor, and his descriptive account of the day's events support finding that he gave credible testimony that he could not read the temporary tag from a safe driving distance even though there were some minor inconsistencies in his testimony.    *See e.g., United States v. Simmons,* 174 F. App'x 913, 917 (6th Cir. 2006) (finding officers' testimony credible because it was substantively consistent).

Moreover, no evidence suggests that glare on the Mercedes's angled rear window and defrosters would not actually inhibit the visibility and legibility of the temporary tag from a safe driving distance.    While Wilkey certainly had an incentive to find a basis for the traffic stop, there is no evidence to indicate that he is fabricating evidence even though his written accounts of the stop fail to mention the specific reasons that he could not read the temporary tag. Understandably, Defendant cries "pretext."    Whatever other subjective reason law enforcement had for making the stop, however, is legally irrelevant.    *See, e.g., United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009) (holding that because the officer "possessed probable cause to believe that a traffic violation occurred when he observed [the defendant] not wearing a seatbelt, [the officer's] motivation for making the stop (suspicion of unlawful possession of a firearm) did not undermine [the constitutionality of the stop].");  *Hughes*, 606 F.3d at 315-16 (rejecting the district court's analysis as to why the officer "*really*" stopped the vehicle);  *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (citing *Whren*, 517 U.S. at 812-13 (1996)) ("[A]n officer may

stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle."); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful").

By his own account, Wilkey was looking for any lawful reason to stop the Mercedes. Defendant unwittingly provided Wilkey with the reason he was looking for by riding in a car with a temporary tag placed where Wilkey could not read it as he followed the Mercedes from a safe driving distance. It is well established that "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *Blair*, 524 F.3d at 748 (original brackets and citation omitted).

That Wilkey *could* see the tag once he approached the Mercedes on foot does not change the results. True, the reasonable suspicion for the stop in this case was completely dispelled before Wilkey made contact with the occupants of the Mercedes. However, the Sixth Circuit held in *Simpson* that it is "surely permissible" for the officer, after executing the stop, and even after concluding that there was no violation of the law, to inform the driver why the stop was initiated. *Simpson*, 520 F.3d at 543; *see also United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir. 2006) (holding that once the trooper was able to read the temporary tag, the trooper "as a matter of courtesy, should have explained to [the] Defendant the reason for the initial stop

Case 1:17-cr-00069-TRM-SKL    Document 146    Filed 10/16/17    Page 13 of 14
PageID #: 526

and then allowed her to continue on her way without requiring her to produce her license and registration.").[7]

Accordingly, I **FIND** the government has met its burden to establish reasonable suspicion for the stop and I **RECOMMEND** that Defendant's motion to suppress be **DENIED.**

### III.    CONCLUSION

For the reasons stated above, I **RECOMMEND**[8] that Defendant's motion to suppress [Doc. 117] be **DENIED** in its entirety.

s/ *Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[7] As previously noted, Wilkey testified that upon his approach to the driver, he immediately detected that she was intoxicated.  Had Wilkey not developed further reasonable suspicion, the encounter would have ended upon his informing the Mercedes's occupants of his reason for the stop presumably without any further detention to obtain and check licenses, question the occupants, or search the car.  *See, e.g., United States v. Jones*, 479 F. App'x. 705, 712 (6th Cir. 2012) (holding that a police officer exceeded the scope of a traffic stop for failure to display proper license plates when he detained the driver after he observed a lawful temporary tag in plain view); *United States v. Trestyn*, 646 F.3d 732, 744 (10th Cir. 2011) (When approaching the vehicle it became clear to the officer that the tag satisfied all statutory requirements and thus the Tenth Circuit held questions of the drivers about their travel plans and a request for their licenses "exceeded the scope of the stop's underlying justification because . . . [the officer] no longer had an objectively reasonable articulable suspicion that a traffic violation had occurred or was still occurring."); *State v. Coleman*, 890 N.W.2d 284 (Iowa 2017) (collecting and analyzing federal and state traffic stop cases to determine a traffic stop was unconstitutionally prolonged when the officer asked for the male driver's license and registration because, after the officer realized the driver was not the female registered owner with a suspended license, there was no valid ongoing traffic stop).

[8] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).