UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | Case No. 1:17-cr-69 |
| v. | ) | |
| | ) | Judge Mattice |
| | ) | Magistrate Judge Lee |
| TRAVIS DEWAYNE MELTON | ) | |

## ORDER

On October 16, 2017, United States Magistrate Judge Susan K. Lee filed her Report and Recommendation, [Doc. 146], pursuant to 28 U.S.C. § 636(b)(1). In her Report and Recommendation (hereinafter "R&R"), Magistrate Judge Lee recommended that Defendant's Motion to Suppress, [Doc. 117], be denied. Defendant filed timely objections to the R&R. [Doc. 164]. The United States filed a response. [Doc. 177]. The Court has now reviewed the entire record relevant to the instant objections, and for the reasons described below, the Court will **ACCEPT and ADOPT** Magistrate Judge Lee's R&R and will **DENY** Defendant's Motion to Suppress.

I. FACTS

Other than Defendant's objection to Former Deputy Jesse Wilkey's ("Wilkey") credibility, the Parties do not otherwise object to the Magistrate Judge's factual determinations, and the Court concludes that they are accurate. The pertinent facts as summarized by Magistrate Judge Lee are as follows:

> On February 23, 2017, Wilkey was in his marked patrol car engaged in his regular patrol duties, including the duty to look for and ticket traffic violations. At some unknown time prior to the stop at issue, Wilkey was contacted on his cell phone by his "superiors" at the Rhea County Sheriff's Office and told to be on the lookout for a silver Mercedes Benz ("Mercedes"). The superiors requested that Wilkey look for a traffic

violation involving the Mercedes and conduct a traffic stop of it "if it had a traffic violation."

Around 4:23 p.m., Wilkey saw the described Mercedes traveling in a northbound lane as he drove southbound on Highway 27, which has two lanes in each direction and a median. Wilkey quickly turned around to catch up to the Mercedes. He was "probably a half a mile" behind when he began traveling north. As he traveled, he observed the Mercedes change lanes. At various times in his testimony, he described the traffic as "busy" and the day as sunny, clear, and dry.

Wilkey initially indicated he was a safe driving distance behind the Mercedes without any cars between him and the Mercedes as he neared the turning lane to the Walmart. He subsequently indicated that there may have been cars between him and the Mercedes near the turning lane and that he could not specifically recall whether there were any such cars. As he got closer behind the Mercedes, while there still may have been a car between him and the Mercedes, Wilkey thought the Mercedes abruptly "turned right from the turn lane" (without stopping at the red light) toward the Walmart parking lot. Wilkey believed the turn to be abrupt to avoid him, but he did not indicate it was any sort of traffic law violation.

As he pulled a safe following distance of a car length to a car length and a half behind the Mercedes, "right before" they got to the Walmart, Wilkey looked for tag information to "call in on the radio" and observed what he thought was a "drive out," or temporary tag, violation. With no cars between him and the Mercedes at that time, Wilkey concluded the tag was "improperly displayed" because he could not read the expiration date numbers on the tag due to the tilt of the rear window and the glare of the sun on the defrosters and glass. Specifically, Wilkey could see that the Mercedes had a temporary tag taped to the inside of the rear window, but he could not "read the tag to even tell if it's expired or not, so I stopped it then."

Wilkey agreed that he stopped the Mercedes for two reasons: (1) his superiors asked him to stop it if he observed a traffic violation and (2) he observed what he concluded was the improper display of a drive out tag. Wilkey testified that if he could have read the tag information from a safe driving distance, then the choice to display the tag taped to the rear window (instead of on the rear area of the car designated for placement of a permanent license plate) would not be considered a violation of Tennessee law. He agreed that distance and viewing angle affect the ability to read a drive out tag placed in a rear window.

Wilkey activated his siren and blue lights in the Walmart parking lot. The Mercedes then came to a "crossways" stop in a parking space, and Wilkey pulled his patrol car behind the Mercedes. Wilkey called in the stop, but could not call in the tag information as he still could not read the temporary tag even when stopped behind the Mercedes in the parking lot. It was not until he approached the Mercedes on foot that Wilkey could see the numbers on the temporary tag. At that point, Wilkey could see that the

tag was current, was not "blocked" by a tag frame, sticker, or other foreign material, and was in good condition.

Wilkey testified that upon his initial contact with the driver, he immediately detected that she was intoxicated. He also testified that it was after he detected her intoxication that he asked for each occupant's driver's license. After he obtained the license of both the driver and Defendant, who was the sole passenger in the Mercedes, he returned to behind his patrol car "to call in the information."

Most events that occurred after the stop are not directly at issue in the motion to suppress and will not be addressed herein. As pertinent to the motion to suppress, a Tennessee Multiple Offense Citation, which Wilkey began completing at 4:47 p.m. the day of the stop, was issued to the driver for "[i]mproper display" of the tag in violation of Tennessee Code Annotated § 55-4-110 and driving without proof of insurance at the time of the stop in violation of Tennessee Code Annotated § 55-12-139. The citation, which was made Defendant's Exhibit 1, contains a narrative for the violation of § 55-4-110, which states only: "Drive out tag was unable to be read."

Eventually, cash and methamphetamine, the evidence Defendant seeks to suppress, were located in the Mercedes. Defendant was arrested and transported to the jail around 5:26 p.m. and, thereafter, Wilkey prepared the text of his arrest report before his shift ended at 7:00 p.m. that night. The Affidavit of Complaint and Arrest Warrant, Defendant's Exhibit 2, were presented to the state court and signed by Wilkey the next morning. None of the documents prepared by Wilkey mention a specific reason he was unable to read the tag, such as glare.

Wilkey identified Government's Exhibit 1 as a photograph of the tag in the rear window of the Mercedes taken on a different day in wet weather conditions.

[Doc. 146 at 1–4].

## II. ANALYSIS

Defendant raises two objections to the R&R. First, he asserts the R&R's reasonable suspicion finding fails to afford deference to the Tennessee courts' interpretation of the statute at issue. Next, he argues Magistrate Judge Lee erred in finding Jesse Wilkey's testimony credible. The Court will address each objection in turn. The Court reviews *de novo* the R&R's legal findings that are objected to by Defendant. 28 U.S.C. § 636(b)(1)(C).

## A. Reasonable Suspicion and Tennessee's Tag Statute

In his first objection, Defendant claims the Magistrate Judge's reasoning in the R&R is overbroad and fails to afford deference to the interpretations of Tennessee courts with respect to the state's tag display statute, T.C.A. § 5-4-110. [Doc. 164 at 1–2]. Further, Defendant seems to argue the Tennessee tag statute is void for vagueness, or at least the Magistrate Judge's interpretation is vague. [*Id.*]. To the extent Defendant is arguing the statute is void for vagueness, those new arguments are improperly raised and will not be addressed. *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000) (holding new arguments cannot be raised for the first time in an R&R objection).

Defendant's objection blurs the line between two distinct issues. The chief issue revolves around the Constitution's reasonable suspicion standard and its requirements. The other related issue involves Tennessee's tag display statute and the contours of its "clearly legible" standard. Although they are intertwined, the pertinent issue is whether Wilkey's traffic stop was supported by reasonable suspicion, not if the tag's location actually violated the statute. *United States v. Simpson*, 520 F.3d 531, 542 (6th Cir. 2008) ("… the proper question is not whether [defendant] was, in fact, violating [the tag statute] … The question is whether [the police officer] had an objectively reasonable suspicion that a violation of that statute was occurring."). When addressing the state law issue, the Court is instructed to step carefully and not unnecessarily create new, broad interpretations or disturb contours already set forth by Tennessee judges. *Id.* at 544. State courts are the definitive interpreters of their state's laws and federal courts honor those decisions as a principle of federalism. As to the Constitutional issue, Tennessee law does not control this Court's interpretation of the United State Constitution. State and lower federal courts share independent and concurrent jurisdiction to interpret the

Constitution; in this context neither system controls the other but both are bound by the United States Supreme Court. *See Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970) ("Each system proceeds independently of the other with ultimate review in this Court of the federal questions raised in either system."). The Court will first address Defendant's tag statute interpretation arguments.

### i. Tennessee's Tag Statute

The Tennessee license plate attachment statute holds, in relevant part:

> Every registration plate shall *at all times* be securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches (12″) from the ground, measuring from the bottom of the plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be *clearly legible*; provided, if a motorcycle is equipped with vertically mounted license plate brackets, its license plate shall be mounted vertically with the top of such license plate fastened along the right vertical edge. No tinted materials may be placed over a license plate even if the information upon the license plate is not concealed.

T.C.A. § 55-4-110(b) (emphasis added) [herein the "tag statute"]. Because of its lowly nature as a law prescribing how and where a licenses plate should hang on a vehicle, there are few Tennessee cases that specifically give form to the tag statute's standards, which requires a tag be "at all times … clearly legible." *Id.*; *see also Simpson*, 520 F.3d at 535 n.4 (explaining the scarcity of opinions regarding § 55-4-110 application to out-of-state tags is "likely due to the fact that traffic offenses in Tennessee are tried in Municipal and General Session courts, which are not courts of record."). The Tennessee Court of Appeals has interpreted the statute in the context of the Fourth Amendment and whether an officer had reasonable suspicion to believe the statute had been violated. Many of these opinions, however, do not reach specifics regarding the bounds required by the statute's standards, and instead limit the issue to whether an officer had

5

reasonable suspicion the statute was being violated when making a stop. *See State v. Hall*, No. E2006-01915-CCA-R3-CD, 2007 WL 2917728, *4 (Tenn. Crim. App. April 17, 2007).

The case *State v. Hall* is the most obvious example of this issue. In that case, a police officer stopped a van that had a license plate attached to a ladder strapped to the back of the defendant's van. *Id.* at *1. To justify his stop, the police officer claimed the tag was "hard to see." *Id.* When asked to determine whether the officer's bare assertion that a tag was "hard to see" constitutes sufficient grounds for reasonable suspicion, the Tennessee Court of Appeals held it was not a "'particularized and objective basis' for suspecting that the defendant was in violation of a traffic offense." *Id.* at *4. The *Hall* court did not, however, reach the issue of whether attaching a license plate to a ladder on the back of a van was a violation of the Tennessee statute. *See generally id.* The tag may have been in violation of the statute. For instance, if in *Hall* the ladder to which the tag was attached had been swaying back and forth, the driver would have been in violation of the express terms of the statute, which requires a license plate to be secure so as to "prevent the plate from swinging." T.C.A. § 55-4-110(b). However, the *Hall* court did not reach such facts because the issue was not whether the defendant in *Hall* violated the statute; rather the issue was whether the officer's proffered reason for the stop was sufficient reasonable suspicion under the Constitution. *See id.*

Unlike *Hall*, the Tennessee Court of Appeals decision in *State v. Hunt* does interpret the contours of the tag statute and its requirements. 302 S.W.3d 859 (Tenn. Crim. App. 2009). There, the court was asked to determine whether an officer had reasonable suspicion to pull over a vehicle because its license plate was not lit by a tag light at night. *Id.* at 861. The *Hunt* court determined that a traffic stop based on a driver

6

not having a tag light does not constitute reasonable suspicion because the tag statute did not require drivers to illuminate their license plate with a tag light. *Id.* at 865[1] (refusing to follow the reasoning in *State v. Herman Leo Matthew*, No.M2001-00754-CCA-R3-CD, 2002 WL 31014842 (Tenn. Crim. App. Sept. 10, 2002), which had upheld a stop of a vehicle for lacking a tag light).

Defendant points to *Hunt* and *Hall* to argue the principles of those cases support a general rule that violations of the tag statute cannot be founded upon conditions outside of a driver's control, such as "darkness, brightness, and rain." [Doc. 164 at 3]. However, this Court has been instructed to avoid "sweeping" generalizations when applying state law, in particular Tennessee's tag display statute. *Simpson*, 520 F.3d at 544. Further, after carefully reviewing *Hunt*, Defendant's reading is inconsistent with that opinion. The court's holding was not based on the broad reasoning that "uncontrollable conditions" cannot constitute violations of the tag statute. [Doc. 164 at 4]. Instead, the Tennessee Court of Appeals reached its holding after a careful and detailed consideration of relevant legislative history regarding license plate illumination in Tennessee and elsewhere. *See Hunt*, 302 S.W.3d at 863–65. Conspicuously missing from the *Hunt* decision is any discussion related to "uncontrollable conditions." *See id.*

Defendant may be correct that conditions beyond a driver's control cannot be the basis for a traffic violation. Regardless of the truth of that well-reasoned argument, if the Mercedes violated the tag statute, it was not merely the result of the sun's position in the sky. Instead, the statute would have been violated due to where the tag had been placed, which was behind the defroster lines of an angled back-windshield that reflected

---

[1] It is doubtful that the *Hunt* decision's holding remains good law. Since the time it was decided, the Tennessee legislature has amended the tag statute to include a tag light requirement. *See* T.C.A. § 55-4-110(c) (holding "the registration plate shall be illuminated at all times the headlights are illuminated.").

sunlight and made the tag not "clearly legible" … "at all times." T.C.A. § 55-4-110(b). The tag's placement was within the driver's control. However, whether placing a license plate in a location in which it can be obstructed by the setting sun's glare does not have to be reached, and neither did Magistrate Judge Lee reach that statutory interpretation issue. [Doc. 146 at 11]. Instead, the Magistrate Judge held the facts were sufficient to support a finding that there was reasonable suspicion that the statute was being violated. [*Id.*]. As such, because the R&R did not reach the interpretation issue, it did not intrude upon the space reserved for Tennessee judges or fail to accord deference to their rulings.

Defendant also seems to briefly assert the R&R's interpretation of the tag statute gives rise to concerns related to the void for vagueness doctrine. [Doc. 164 at 4–5]. The Defendant did not cite—nor can the Court find—support for the assertion that the void for vagueness doctrine applies to judicial opinions or that a court's statutory interpretation can render the interpreted statute vague. As such, those arguments are disregarded as lacking merit.

### ii. Reasonable Suspicion

The Constitution's Fourth Amendment preserves the people's right to be free from undue governmental searches and seizures. U.S. Const. amend. IV. Temporary police stops for the purposes of a law enforcement investigation are "seizures" to one's "person." *Terry v. Ohio*, 392 U.S. 1, 18–19 (1968). Likewise, a traffic stop of a vehicle is such a seizure. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Seizures are not prohibited by the Constitution; rather, the Constitution requires a seizure be reasonable under the circumstances. A reasonable traffic stop is one supported by a "reasonable suspicion" that there is an on-going crime or traffic violation, or a completed felony. *United States v. Simpson*, 520 F.3d 531, 540 (2008).

8

The "reasonable suspicion" standard is an "elusive concept" that must flexibly apply to the infinite factual scenarios in which law enforcement officers may find themselves. *Cortez*, 449 U.S. at 417–19; *see also United States v. Arvizu*, 534 U.S. 266, 275 (2002) ("[R]easonable suspicion is somewhat abstract"). "Articulating precisely what 'reasonable suspicion' … means is not possible. [It is] a commonsense, nontechnical conception[] … [T]he standard[] [is] not readily, or even usefully, reduced to a neat set of legal rules." *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996). However, although designed as an adaptable standard, reasonable suspicion must be based on something more than "inarticulate hunches." *Terry*, 392 U.S. at 22. Police officers must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 418. This "demand for specificity in the information upon which police action is predicated is the central teaching of … Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n.18.

When determining whether a police stop is "predicated" upon sufficient particularity, Courts are directed to look at the "whole picture" and to take into account the "totality of the circumstances." *Cortez*, 449 U.S. at 418. There are two elements considered in determining whether a stop is permissible under the Constitution. *Id.* First, the assessment considers all relevant information available to the stopping officer. *Id.* This includes, but is not limited to, general objective observations, "information from police reports, if such are available, and considerations of the modes or patterns of operation of certain kinds of lawbreakers." *Id.* It is from this information "a trained officer draws [the sort of] inferences and makes deductions … that might well elude an untrained person." *Id.* The second element zeroes in on the suspect and considers, based

on the available information, whether an officer had particular suspicion the "individual being stopped is engaged in wrongdoing." *Id.*

When testifying, Wilkey made it clear his stop was not made *because* the Mercedes' tag was temporary, which would not constitute reasonable suspicion. *Simpson*, 520 F.4d at 543 (quoting *United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000)). Nor did Wilkey testify his stop was based simply on the location of the temporary tag; he believed taping a temporary tag inside a back window was perfectly legal if the tag were legible. Wilkey testified he stopped the Mercedes because he was unable to read the car's temporary tag from a distance of one to one-and-a-half car-lengths away from the car and when no there were no vehicles in between the cars. Wilkey further explained the sun's glare obstructed the tag, and the glare resulted from the glass, the window's angle and defrosters. Wilkey's reasoning is far from an assertion that the tag was difficult to see "at some unspecified distance or position" and for some unspecified reason. *Simpson*, 520 F.3d at 544. Instead, Wilkey's justification is a particularized and objective basis for reasonable suspicion. *Id.* Like the officer in *Simpson*, Wilkey could not read the tag's information until he exited his patrol car and was standing a few feet from the Mercedes. *Id.* at 542. Further unlike in *Simpson*, not only was Wilkey unable to see the tag's expiration date, he was also unable to see its identification number to "call in" the tag. "Although we are aware of no Tennessee case law that indicates a precise distance from which a temporary tag's expiration date must be visible, it seems reasonable to assume that more than a few feet is required." *Id.* If Tennessee's tag display law serves any purpose, it is "presumably to provide" law enforcement a means of readily identifying vehicles when traveling behind them within a reasonable distance. *Id.* at 536. Here, because Wilkey was unable to read the license

plate due to its placement, he had reasonable suspicion to believe Tennessee's tag display statute was being violated.

Defendant also asserts Wilkey's reasoning was merely pretext. Wilkey admits he was looking for a reason to stop the car after being told to do so by his superiors.[2] However, Defendant's arguments are misplaced. The law in this area is well settled. "Subjective intent alone … does not make otherwise lawful conduct illegal or unconstitutional." *Whren v. United States*, 517 U.S. 806, 813 (1996) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). Court precedent has long since "foreclose[d] any argument that the constitutional reasonableness of traffic stop depends on the actual motivations of the individual officers involved." *Id.* The Court finds, as such, Wilkey's actual intent for stopping the Mercedes is irrelevant under these circumstances. Accordingly, Defendant's objection to Magistrate Judge Lee's findings regarding reasonable suspicion is **OVERRULED**.

---

[2] As opposed to the stop request undermining Wilkey's reasonable suspicion, it actually provides an alternative route for reasonable suspicion. Wilkey was told to stop the vehicle because it had been observed leaving a storage unit that was under surveillance as a location suspected of storing and distributing methamphetamine. [Doc. 136 at 1–2]. Defendant acknowledges there was a larger, on-going investigation in which the Mercedes had become a target after officers had seen it at the target storage unit earlier. [Doc. 117 at 2]. While the Mercedes was at the storage unit, police observed the Defendant and the driver of the Mercedes go into the storage unit, bring out an object, and place the object in the trunk of the Mercedes. [Doc. 136 at 1–2]. After this, the officers conducting the surveillance notified local police departments, including Wilkey's department, and requested officers to be on the lookout for the Mercedes and stop the vehicle for a traffic violation if possible. [*Id.*] The requesting officers wanted a separate justifiable reasonable suspicion for a stop in order to protect the existence of the on-going investigation and prevent it from being compromised. [Doc. 117 at 2]. Law enforcement is a cooperative enterprise and the knowledge of some officers is imputed to others when an officer with reasonable suspicion requests other officers to make a stop. *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012). This is known as the "collective knowledge doctrine." *Id.* It is likely what the officers saw at the storage unit created enough reasonable suspicion to justify a stop. Under the theory, reasonable suspicion was imputed to Wilkey when he made his stop because it was done at their request and in accordance with their directions. *See id.* at 768 (holding officers had reasonable suspicion to make a stop after it was made at the request of the DEA, even though the stopping officers were unaware of any specific facts that supported making the stop).

### B. Former Deputy Jesse Wilkey's Credibility

Defendant next objects to the Magistrate Judge's finding that Wilkey's testimony is credible. Defendant claims Wilkey's testimony is not reliable because: (1) Wikley's citation reports prior to his hearing testimony did not include the reasons for the stop that he gave at the suppression hearing, (2) Wilkey was uncertain and could not recall when there were vehicles between him and the Mercedes when traveling behind the vehicle, (3) Wilkey had an incentive and was looking for a reason to stop the Mercedes, and (4) Wilkey conjured up proffered reasons for the stop *ex post facto*. [Doc. 164 at 5–6]. Defendant asserts the "totality of the inconsistencies" in Wilkey's testimony is beyond what the R&R classifies as minor, "especially when he had a specified motive to find a pretext for stopping the Mercedes." [*Id.* at 6].

Magistrate Judge Lee's determinations regarding Wilkey's credibility were based on first-hand observation of Wilkey as he testified at a hearing. By contrast, this Court's review is based on the briefings and a transcript of that hearing. Courts are instructed to be "sensitive to the problems of making … determinations on the cold record." *United States v. Raddatz*, 447 U.S. 667, 669 (1980). A written transcript of a hearing does not "convey the evidence fully in its most important elements … It cannot give the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration …" *Id.* (quoting *Queen v. Bertrand*, 16 Eng. Rep. 391, 399 (1867)). In most cases, a magistrate judge's credibility determinations based on in-person testimony should not be overturned until the district judge concludes they are incorrect after conducting a second hearing. *United States v. Johnson*, 631 F. App'x 299, 301 n.1 (6th Cir. 2015). In order to ensure efficient case resolution and prevent duplicative efforts, a magistrate judge's credibility

determinations reached after conducting a hearing are afforded deference unless it appears the findings are clearly erroneous or the testimony is irreconcilably inconsistent with the established record. *Raddatz*, 447 U.S. at 684 ("[I]n providing for 'de novo determination' rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed finding and recommendations."). Defendant's arguments do not meet this burden, but the Court will briefly address each contention in turn.

Wilkey's traffic citation, which appears to have been filled out during the stop, states the Mercedes violated the tag display statute because the "Drive out tag was unable to be read." Because Wilkey's testimony went beyond the threadbare assertion in the traffic citation's narrative, Defendant claims Wilkey's testimony should be disregarded. However, this written narrative is not inconsistent with Wilkey's testimony; it is only less detailed. Further, when determining whether a stop was based on reasonable suspicion, courts are not limited to contemporaneous writings completed by the stopping officer, if any; instead courts are instructed to look at the totality of the circumstances surrounding the stop. *Cortez*, 449 U.S. at 418. At the hearing, Wilkey was properly permitted to testify to facts beyond what he had written in his traffic citation. A less detailed written report completed in proximity to the stop is not sufficient to defeat a finding of reasonable suspicion if it is consistent with the officer's subsequent testimony.

Next Defendant alleges, because he had an incentive to create *ex post facto* justifications for his stop, Wilkey improperly justified his stop by fabricating excuses to support reasonable suspicion after-the-fact. However, there is nothing in the record that suggests Wilkey did so. Further, Magistrate Judge Lee, upon witnessing Wilkey first-

hand, found his testimony to be truthful and not an after-the-fact justification, which she acknowledged would have been impermissible.

Finally, Defendant argues Wilkey's testimony cannot be relied upon because had trouble remembering specifics regarding when vehicles separated his patrol car from the Mercedes while he was traveling behind it. However, Magistrate Judge Lee found Wilkey convincingly remembered there was a moment when traveling behind the Mercedes in which he was driving within a safe distance and the two cars were not separated by vehicles. Again, this finding is not contrary to the record. Accordingly, because there appears to be a sufficient evidentiary basis for the Magistrate Judge's finding, the Court **ADDOPTS** the Magistrate Judge's credibility determinations and **OVERRULES** Defendant's objection.

### III. CONCLUSION

For the reasons stated herein

- Defendant's Objections, [Doc. 164], are hereby **OVERRULED**;

- Magistrate Judge Lee's Report and Recommendations, [Doc. 146], is hereby **ACCEPTED and ADOPTED**; and

- Defendant's Motion to Suppress, [Doc. 117], is hereby **DENIED**.

**SO ORDERED** this 12th day of December, 2017.

    */s/ Harry S. Mattice, Jr.*
    HARRY S. MATTICE, JR.
    UNITED STATES DISTRICT JUDGE